The next matter, case number 161004 Andrew S.F. Cullen v. Neil Janvrin Mr. Marvelli? Good morning, your honor. Good morning. My name is Jake Marvelli and together with Paul McEachern we represent the plaintiff appellant Andrew Cullen. May it please the court that this is a case about defendant police officers misleading magistrates to obtain arrest warrants. The defendants facts in their arrest warrant were derived from one witness and the defendants knew she was fatally unreliable. The prosecutor who attended an interview of that witness told the defendants that they needed to obtain her complete records to assess whether she could establish probable cause. The defendants failed to do so. They represented her as credible to a magistrate anyway and in doing so they violated Mr. Cullen's fourth amendment rights. Didn't they check out a lot of these facts and they checked out correctly? No, your honor. What happened was there was a controlled interview in November of 2011 at the Child Advocacy Center. The purpose was to provide a controlled generic scene for the witness to be interviewed. She was a mentally disabled adult. At the conclusion of that interview there were two people in attendance of relevance to the case today, your honor. First is there was a prosecutor, assistant county attorney Jerome Blanchard. He was the only representative from the prosecutors office. Defendant detective Raymond was the only representative from the police department. There is a joint issue of fact on how that interview ended. Defendant Raymond affairs on deposition that he was told to arrest Andrew Cullen as a result of that interview. Prosecutor Blanchard who the defendants perceive as their boss as a prosecutor disputes that and on deposition testified that he told defendant Raymond he needed to obtain CL's quote complete records and he disputes that he told the defendants to arrest Andrew Cullen. After that the next major investigation was an interview that detective Raymond performed in December of 2011. He did that outside the controlled process. He did that without contacting prosecutor Blanchard and he did so to inquire with leading questions about the use of a gun. That's another disputed fact in the case, your honor. I'm sorry. Judge Torea said weren't some facts confirmed. The answer is yes. The woman who made the charge said he had a gun. Okay. There was a gun. Now can we go back to exactly what was misleading and exactly what was omitted? Yes, your honor. What was misleading was the representation of CL as credible to the magistrate. There was no representation made. There was full disclosure that this woman was mentally impaired, severely mentally impaired. What else were they required to do? What they were required to do, your honor, is when they received the directive from the prosecutor to obtain those complete records, they had a duty to investigate. They had asked for the records earlier or some records earlier. No, your honor. That's a disputed fact. On deposition. They say they asked. I understand, your honor. And what we did is we deposed CL, the witness's mother, and she testified that she always complies with requests for waivers and she did not recall. She didn't recall. Correct, your honor. Can we move on? What else? Yes, your honor. In the arrest warrant, they represented that CL was, that she was under the care and supervision, for example, of Andrew Cullen. And the reason why that was an issue of fact is that had they investigated, they would have determined that CL was under constant supervision as part of her live-in residence program and that not even the Cullen parents who were looking after CL by agreement with an Easter Seals company, a nonprofit, not even their children could look after CL. There would not have been a scenario where Mr. Cullen would have been home alone with CL's. We're trying to figure out whether qualified immunity applies? Yes, your honor. So you have to show more than that they did something wrong. They have to have done something unreasonably wrong. And so the question is, how extensive an investigation would have it been, at least to me the question is, how extensive an investigation would have it been clear they had to engage in in order not to have violated the Fourth Amendment? And I don't quite see what you're saying that relates to that question. These might all be perfectly reasonable things to raise if you were just trying to get the thing thrown out. But what you really are trying to say is that they violated a clearly established law in what they did. And I think that means you've got to say it was very clearly established that they had to investigate in some much more substantial way than they did, notwithstanding the fact that you can see they did some investigation. It's not like they talked to this person, just walked in and brought the papers. So what are you relying on to show that there's something clear about them not doing enough of an investigation? What's clear is, your honor, I would analogize it to the VCR Transportation Company case. And in that case, the police investigators, they had a witness who gave an incoherent account of an alleged crime. And that detective manifested some knowledge that the witness was incoherent at the time of the reporting. And the court found that that police detective had a duty of inquiry. And the police detective went out and inquired about some other things. Was it different in the facts here as I read them? There was nothing incoherent about it. She was interviewed, I think, three times, maybe. Am I right? Three times? Twice, your honor. Once in a controlled environment. Twice, okay. And she gave a fairly consistent account about the principal thing that was involved about her being attacked. And one of which, apparently, there was an issue about a black gun used against her. And later investigations showed that your client had a black gun. So what's inconsistent about all this? The inconsistency is, again, on the factual predicate, your honor. So there's a dispute about whether C.L. had alleged the use of a gun at the initial controlled interview. The defendants claim that C.L. did mention it, and it appears in Detective Raymond's narrative report. However, on deposition, Prosecutor Blanchard from the Rockingham County Attorney's Office testified he did not recall C.L. alleging use of the gun. He didn't recall, but the detective, who's the important part here, did recall, and they did find the gun. But that anticipates that Prosecutor Blanchard's testimony was that he had no knowledge or memory of the event. So you're saying as long as there's a disputed fact about whether he mentioned the gun, for purposes of this appeal, we have to assume facts most favorable to you, and therefore, we're supposed to assume that there was no mention of a gun? Because we turn out at trial that you lose on that point, but for purposes of summary judgment, you're just saying the way we should evaluate it is assume everything in your favor, which is the normal standard. Well, yes, and the assumption is reasonable because, Your Honor, Detective Blanchard testified that he hadn't heard anything else about the case until the defendants were executing a search warrant for this gun. And he heard about it because he was sitting next to another county attorney, a police prosecutor, when she received a call for advice on the search. And he was surprised that there was even mention of a gun. So to put aside the gun, I still don't fully understand. They didn't just talk to a witness, take her story, and run to get the papers against her client. They definitely took time. They took the time to actually have a controlled environment to hear her story. And the story wasn't that different over time. And I guess in that setting, I mean, how much corroboration do you have to have? You know, people who are mentally impaired can be attacked. They're dealing with a person who's mentally impaired and who's telling a story, which they seem to be, in a diligent manner, trying to figure out whether it holds up. What is disputed about that aspect of it? And assuming all that's true, why is it clear that they violated established law? If I may, Your Honor, my light is blanked. What was, they knew her reporting had been incoherent. For example, when she made an initial report that is in the record, she had watched the assault had happened in a car. And then at this controlled interview, it happened all day. The police, she also suggested that he had, that a call-in had killed her, that he had killed her baby. There were statements that were incoherent. And there were two options at that point for the police defendants. They could have followed a directive from their perceived boss, Prosecutor Blanchard, to investigate whether CL's testimony on its own could establish probable cause. And that was their directive. They were supposed to obtain her records. They could have obtained the sexual assault evaluation that was performed on CL. They knew that had happened, but they didn't obtain that. Or they could have looked for other extrinsic ways to prove the case. It's important to protect people, but it's also important to protect the Fourth Amendment right. And in choosing the third option... So they evaluated no physical evidence prior to seeing the papers? No, and they knew, Your Honor, there was a sexual assault evaluation. We didn't obtain it in discovery. I don't know what it would say, what the Fourth Amendment import is. They didn't even look for it when they knew it was there. So time had gone by, but there were very obvious, critical steps that they were supposed to take, even at the direction of Prosecutor Blanchard. And they didn't do those things. And instead, a month after the controlled interview, a gun appears on the record, and they ask leading questions of CL about it, and they found a gun. Well, of course they're going to ask leading questions. There's nothing wrong with that. Your Honor, I understand. CL's mentally disabled. And you say the stories are inherently inconsistent, and we don't read the record that way. All right. Thank you. Thank you, Your Honor. Ms. Leonard, good morning. Good morning. May it please the Court, my name is Caroline Leonard from Concord, New Hampshire, and I represent the town of Fremont, New Hampshire, Neal Janvran and Adam Raymond. This case is different from BCR. In BCR, the police relied exclusively on the victim's testimony without readily investigating firsthand sources of information. Here, the Fremont defendants took several additional steps, besides taking CL's reporting at face value. The additional steps included arranging and observing the Child Advocacy Center interview. The steps included attempting to interview members of the Cullen household, which they refused to do. The steps also included executing a search warrant for the small black gun that was mentioned earlier and recovering a gun that was consistent with what CL had described plaintiff had brandished during the rape. This corroborated her claim. What about the additional medical records and the sexual assault evaluation? Yes, Your Honor. With respect to the medical records, on December 15, 2011, the County Attorney's Office called a meeting with the Police Department. At that meeting, Deputy County Attorney Tom Reed, who was Prosecutor Blanchard's supervisor, instructed the Fremont Police Department to arrest plaintiff. This superseded the request for medical records. Had there been a request for medical records? That's disputed, Your Honor, but it's not a genuine issue. But the officers say they didn't make such a request. No, Your Honor. The officers did attempt to make a request for the medical records. It is undisputed that the medical records were not obtained prior to plaintiff's arrest. I'm sorry. Does the record show what cognitive learning delay means? Are you referring to within the arrest warrant, Your Honor? No, I'm talking about the record in this case. They say that the party here involved had cognitive learning delay. That's correct, Your Honor. Is that the only thing the medical records show? No, Your Honor. The medical records are quite voluminous. They would also have indicated CL's treatment over her entire life, essentially. For what? For that cognitive learning delay, Your Honor. And what is cognitive learning delay? Is that in the record, or do I look it up somewhere? I believe it's addressed in the medical records, Your Honor. The police are specifically trained to evaluate witnesses. They are the forensic interviewer. Can you tell me briefly, in non-medical terms, what that means? I'm not a physician, Your Honor, but my layman's interpretation of that term would be that CL has a learning disability. She has about the IQ, I believe it is, of a five-year-old. So her understanding of the sex act and the terms that she uses to describe it, which opposing counsel referred to as killed my baby, those merely demonstrate a simple association of the act of sex and her inability to properly describe it. Was the sexual assault evaluation obtained prior to seeking the arrest? Are you referring to the rape, Kate, Your Honor? Yeah. No, it was not, Your Honor. And why is that? I don't know, Your Honor. It was not obtained. We do know from the record that it was requested in November of 2011. Requested by whom? Pardon? Requested by whom? By the Department of Elderly and Adult Services, Your Honor. That's the state agency that oversaw CL's foster care. They request, so law enforcement never requested it? I believe the request, Your Honor, if I understand the process correctly, is that the request needed to come from the department in charge of CL, and that was the Department of Elderly and Adult Services. When small children make an allegation of this kind, is there any kind of practice of whether any physical evidence needs to be examined before you go ahead and arrest somebody on the basis of a five-year-old's testimony? I don't know the answer to that, Your Honor. I'm sorry. Is there any evidence that the police were aware that the request for the rape kit evidence had to come through this agency and not through them? Could you rephrase that, Your Honor? Were the police aware that the request for the rape kit evidence had to come through the agency which ultimately made the request? Yes, they were, Your Honor. So that's an explanation for why they did not directly ask for it, because they understood it would only be turned over to this agency on the agency's request. Yes, Your Honor. All right. Just so I get the timing right, the arrest occurs when in relationship to November, you said, is when the request is made for the rape kit? That's correct, Your Honor. And then the arrest occurs when? December 19, 2011 was when the plaintiff turned himself in. The arrest warrant was issued on December 16, 2011. And so the police are aware that there's a request for a rape kit as of November, and they're aware they haven't gotten it back but then make the arrest five weeks later? That's correct, Your Honor. And if I may, the alleged rape at issue supposedly occurred in September or October of 2011. Requesting a rape kit in November 2011 is far too temporally attenuated to have had any merit, even if they had in fact obtained it. Your Honor, as qualified immunity applies. What do you mean? Do you mean? I thought there was the rape kit done around the time of the alleged assault? No. No rape kit was done in connection with the assault. There is a later request, months later. Correct, Your Honor. But it's going to be useless at that point. That's exactly right. All right. All right. If I may turn to the Minnell claim. With regard to the Minnell claim, it is undisputed that Chief Janderin acted pursuant to a superior law enforcement officer's direction. As a matter of law, the police must defer to the county attorney's office as the agent of the Attorney General. Ingray-Ash, which is still good law, held that the sheriff and local police have a duty to act according to the county attorney's notion of law enforcement. The undisputed facts show that on December 16, 2011, the final decision to arrest Cullen was made by the Rockingham County Attorney's Office, not Chief Janderin. Because the county attorney's office was the final authority on Cullen's arrest, Janderin was not the policymaker for the town. This case has broader implications than narrowly addressing one particular rape victim. If this court accepts Plaintiff's line of logic, any temporarily or permanently impaired or incapacitated victim would be barred from pressing rape charges. Children and disabled adults are easy targets for sexual abusers because they are not typical witnesses. Qualified immunity exists to protect officers like Sergeant Raymond and Chief Janderin from being sued for money damages when they acted reasonably and appropriately in the circumstances. Thank you. Thank you. Thank you, Your Honors. If I may give a couple of citations to the record in response to my fellow counsel's presentation. Are they in your brief? Sorry, Your Honor? Are the citations in your brief? The addendum and the appendix, Your Honor. Oh, I'm sorry, I thought you were talking about cases. I apologize. No, I apologize. Thank you. The court had asked about CL's mental ability. If I may point the court to records obtained from Easterseals on page 261 of the joint appendix, it explains that CL was in the bottom one-tenth of one percentile as far as IQ rank. To address the rape request date, Your Honor, if I may point the court to the Plaintiff's addendum, page 30, that's a fax from BEAS, which is an administrative agency, to the detective explaining that they had asked for a rape kit, which happened on November 9, 2011. I'm sorry. I understood your argument to suggest to this court that a rape kit had been done immediately after and that the police had failed to ask for it. A rape kit had been done immediately from the reporting, so that the administrative body that cared for CL, they received the report in October, and the fax that we have on the record in addendum 30 suggests that the SANE evaluation, the sexual assault evaluation, occurred on November 9, which was before the defendants undertook their investigation into Mr. Cullen. Why would a November rape kit show you anything about an assault in early October? Your Honor, I don't have the expertise to apply. No, but you left the court with an impression that appears to not have any foundation in the record. The point that I had hoped to make, Your Honor, and that I would emphasize, is that there were pieces of information out there, and they concerned CL's ability to report and then whatever the sexual assault evaluation was. And it was a rape case, and it was intended to protect a member of society. And given the concerns that Prosecutor Blanchard had communicated to the defendants, they had an obligation to find out what that information was, because Prosecutor Blanchard, who would have been responsible for presenting the probable cause case to the court from that office. I'm sorry. So your argument isn't that as a matter of law, they were required to investigate further before they presented this. Your argument is a superior told them to investigate further, and therefore the officers are not entitled to qualified immunity? My argument, Your Honor, is that you may not act with a reckless disregard for the truth when applying for a warrant. Because the prosecutor told them to go do some other things? Because of the contradictory information presented by CL combined with the response of the prosecutor, which is a joint dispute in the case. Okay. Thank you. I understand your argument better now. Thank you. Thank you, Your Honors. Thank you, Your Honor.